2024 IL App (1st) 230633-U

SIXTH DIVISION

December 6, 2024

No. 1-23-0633

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16CR07873 |
| ARTHUR CAIN, | ) ) | Honorable |
| Defendant-Appellant. | ) ) ) | Tyria Wilson, Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held:*    We affirm where: (1) the evidence was sufficient to sustain defendant's conviction for first degree murder and concealment of a homicidal death; (2) prosecutor's remarks in closing that misstated evidence were not prejudicial; and (3) trial counsel was not ineffective for failing to elicit favorable testimony that was known from the first trial and failing to object during closing argument.

¶ 2　　Following a jury retrial, defendant Arthur Cain was found guilty of murder and concealment of a homicidal death, and he was sentenced to natural life plus five years in the Illinois Department of Corrections. On appeal, Cain argues that (1) the evidence was insufficient to prove guilt beyond a reasonable doubt; (2) he was denied a fair trial because the State repeatedly misstated the evidence in closing argument; and (3) trial counsel was ineffective for failing to object to the State's improper argument and elicit favorable testimony provided in the initial trial. For the foregoing reasons, we affirm.

¶ 3　　　　　　　　　　　　　　BACKGROUND

¶ 4　　This case was initially tried in 2019, during which a jury found Cain guilty of first degree murder and concealment of a homicidal death. On appeal, this court found the evidence was sufficient to support the conviction but found the evidence closely balanced. *People v. Cain*, 2021 IL App (1st) 191921, ¶ ¶ 30 - 31. We held there was reversible error due to the violation of Rule 431(b) where the court failed "to question the venire members about whether they understood and accepted the principle that they must not consider Cain's decision not to testify as a reason to find him guilty." *Id* ¶ 34. We also found reversible error due to the erroneous admission into evidence of Cain's statements in violation of 725 ILCS 5/10302.1(b) (West 2018) (custodial interrogation conducted at a police station or place of detention is inadmissible as evidence unless an electronic recording is made). Accordingly, we reversed Cain's conviction and remanded for a new trial. *People v. Cain*, 2021 IL App (1st) 191921.

¶ 5　　Cain was retried and was again found guilty of first-degree murder and concealment of a homicidal death. The following facts were elicited at Cain's subsequent trial in November 2022.

¶ 6　　On the morning of December 25, 2015, Dominique Ferguson was preparing food with her family on 125th Street in Chicago. Her cell phone rang several times, but she did not answer.

Dominique later left the house to go to the store and did not return for dinner or to attend church with her family. According to her family, Dominique never missed church.

¶ 7    An unidentified individual with a male voice left a voicemail on a family member's phone. The person sounded upset and stated, "if you don't call me back, if I don't see you today, you better never call me again." Lavonda Blair called the number back and was directed to Cain's voicemail. Blair researched the name and gave Cain's Facebook profile and phone number to Tonya Ferguson, Dominique's mother, who gave the information to Chicago police. Dominique's family reported her missing later that week.

¶ 8    On December 26, 2015, Tiffany Mitchell observed Cain pulling a red suitcase down the street near 115th Street and Princeton. Mitchell and her friend, Jasmine McClure, noted the suitcase looked heavy and asked Cain if he was "pulling a dead body." Cain did not respond.

¶ 9    The next day, Mitchell's son observed a commotion near the corner store at 114th Street and Harvard, noting that people had found a red suitcase in the alley with a dead body inside. Chicago police officer Rodrigo Garay was called to the scene where he opened the suitcase and found a naked young woman in the fetal position. Mitchell and McClure went to the scene and spoke with Officer Garay about what they had seen.

¶ 10    The woman in the suitcase was identified as Dominique Ferguson. She was found with blood in her mouth and fluid coming out of her nose, known as a foam cone. The red suitcase was missing a wheel. A wheel was recovered next to the alley where the suitcase and body were found. Detective James Braun was assigned to the death investigation.

¶ 11    Dominique's body was submitted for an autopsy and testing. Assistant Medical Examiner Dr. Stephanie Powers performed Dominique's autopsy on December 28, 2015. Dr. Powers found no evidence of trauma, natural disease or infection, or sexual assault. She reviewed 2 years of

Dominique's medical history and found no indication of ongoing health conditions, diseases, or drug usage.

¶ 12    According to Dr. Powers, two potential signs of opioid usage are a full bladder and brain swelling. Dominique's body exhibited neither. However, Dr. Powers did find signs of pulmonary edema, fluid in the lungs, as Dominique's lungs were slightly heavier than normal. Dr. Powers concluded this was a non-specific finding that could or could not be related to an overdose.

¶ 13    Dr. Powers also ran in-house toxicology testing on different organs and fluids in Dominique's body, which included tests to detect some opiates and fentanyl. All tests came back negative. Although toxicology testing could not be used to determine a possible cause of death, that combined with the circumstantial evidence of where Dominique's body was found, led Dr. Powers to conclude the death was "homicide by unspecified means, favor asphyxia."

¶ 14    Dominique's blood was then sent to an outside laboratory, NMS Laboratories, to test for approximately 250 additional compounds, including fentanyl and designer opioids. The tests were conducted by Donna Papsun. All tests came back negative for drugs. One month after Dominique's tests, NMS Laboratories expanded their testing to include more fentanyl analogs and designer opioids. Papsun testified new designer opioids and fentanyl analogs began emerging between 2015 and 2016. Dominique's body was not tested for these additional drug analogs and compounds. NMS Laboratories has another laboratory that can conduct additional testing. Papsun was not aware that Dominique's body presented a foam cone. Papsun testified that if she had known, she would have reached out to ask the client if the reports match their expectations.

¶ 15    On January 8, 2016, Mitchell and her daughter saw Cain on a city bus. They exited at 115th and Halsted and flagged down Chicago police officer Amanda Kogut. Kogut then arrested Cain and took him to the station for questioning.

4

¶ 16     Detective Braun was informed of Cain's arrest. He and his partner met with Cain to read him his *Miranda* rights, and Cain agreed to speak with the detectives. Initially, Cain did not admit to having any knowledge of the incident, but after Braun relayed that witnesses saw Cain dragging a suitcase, Cain sighed and began speaking.

¶ 17     Cain stated that he had been seeing Dominique since November 2015. On December 25, 2015, Dominique came over to Cain's apartment, where he claims they had sex. Cain then went into the living room, leaving Dominique in the bedroom. When he re-entered the bedroom, he found Dominique unresponsive. Cain stated that he "stayed up all night thinking of a way to dispose of her."

¶ 18     Cain further stated that he went to a nearby Walmart and purchased a suitcase in which to place Dominique's body. He recounted wheeling the suitcase to where it had been found and confirmed that a woman saw him with the suitcase and asked if there was a dead body in there. When asked if Dominique did drugs, Cain emphatically stated no.

¶ 19     The police also spoke to one of Cain's roommates, Keith Ford. The house Ford shared with Cain had four bedrooms, one for each roommate, each with a locking door. The roommates shared a common room, and the house rules were "no women allowed." Ford reported he left the house early on Christmas morning in 2015 and did not return until approximately 9 p.m. the next day. When he returned, Ford stated there was nobody in the house, and he knew nothing of a death in the home.

¶ 20     Police searched Cain's apartment on April 20, 2016, and recovered rubber gloves, mail, and bedding. No female personal effects or clothing were found. Neither Cain nor Dominique's cell phones were ever recovered. Additionally, no drug paraphernalia was found.

¶ 21    During the trial, the State argued that Cain killed Dominique by asphyxiation in line with Dr. Powers' conclusion following the autopsy and toxicology tests. Cain asserted there was insufficient evidence to prove beyond a reasonable doubt that he killed Dominique because the State focused on the context of how Dominique's body was found. He further asserted that the medical examiner "cannot say with any certainty at all what killed the decedent" and "ultimately just disregarded the foam cone" because the potential opioids in Dominique's system were not identified. Cain admitted that he "did not do the right thing in his panic" by disposing of Dominique's body and not calling 911, but this does not amount to first degree murder.

¶ 22    In its closing arguments, the State argued the foam cone found on Dominique's body resulted from her body being compressed into the suitcase rather than from a drug overdose. They stated, ". . . if this was foam cone that was there that was present from an overdose, you would expect that foam cone to have occurred, come out of her system on Christmas Day, maybe a couple hours after she dies . . ."

¶ 23    The State also mentioned that that there were only 19 cases "out of the thousands of cases they run on a daily basis" that contained novel fentanyl and opioid analogs. This was based on Papsun's testimony that she would select certain cases for additional testing if their reports were unsatisfactory. Within those selected cases, nineteen cases involved either furanyl fentanyl or U-47700, a novel opioid.

¶ 24    During closing arguments, the State conveyed that, per witness testimony and in response to defense counsel's trial strategy, Dr. Powers had "no doubt about the cause of death being homicide." The State also argued, "there was no history of anybody in [Dominique's] family of just dropping dead", and "you don't die of natural [causes] at a young age in that family."

¶ 25    Finally, in its closing rebuttal argument, the State asserted that "it was eliminated that Dominique [*sic*] died of natural causes" and "it was eliminated that a drug overdose or toxicity was any cause of death in this case."

¶ 26    Throughout these arguments, trial counsel only objected to the argument that Dr. Powers eliminated death by overdose and natural causes. All other misrepresentation issues in closing and rebuttal closing arguments were not objected to during or after trial.

¶ 27                                    JURISDICTION

¶ 28    The circuit court denied Cain's motion for a new trial on March 23, 2023, and he filed his notice of appeal on March 29, 2023. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec 7, 2023).

¶ 29                                    ANALYSIS

¶ 30    On appeal, Cain argues that (1) this court should reverse his convictions for first degree murder and concealment of a homicidal death because the evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) he was denied a fair trial because the State repeatedly misstated the evidence in closing argument; and (3) trial counsel was ineffective for failing to elicit favorable testimony provided in the initial trial and for failing to object to the State's improper arguments.

¶ 31                          A. Sufficiency of the Evidence

¶ 32    Cain contends there was insufficient evidence concerning the ability of Dr. Powers to certify Dominique's death as a homicide while ruling out other potential causes, namely a drug overdose or natural causes. As such, the State failed to prove his guilt of first-degree murder beyond a reasonable doubt. He claims that Dr. Powers could not say if Dominique died by

7

homicide; she could only "best certify" Dominique's death as homicide because her body was placed in a suitcase and left in an alley. Cain claims that the petechiae and the fact that Dominique's body was found in a suitcase are insufficient to sustain Dr. Powers' conclusions. Because Dr. Powers could not eliminate death by natural causes, including heart conditions, genetic disorders, or death by drug overdose, Cain contends her testimony is not credible.

¶ 33    When evaluating a sufficiency of the evidence claim, it is the role of this court to determine if any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307 (1979). This court will not substitute its judgment for that of the jury on issues involving the weight of evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 34    The weight of the evidence includes both direct and circumstantial evidence, and a criminal conviction can rest entirely on circumstantial evidence. *People v. Johnson*, 2018 IL App (1st) 150209, ¶ 19; *People v. Pintos*, 133 Ill. 2d 286; *People v. Campbell*, 146 Ill. 2d 363, 380 (1992). A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Jones*, 2023 IL 127810, ¶ 28. We must allow all reasonable inferences from the record in favor of the prosecution. *People v. Cunningham*, 212 Ill. 2d 274 (2004).

¶ 35 Dr. Powers differentiated between the cause and manner of death, and stated that Dominique's cause of death was, "best certified as homicide by unspecified means, favor asphyxia" based on her professional examination of Dominique's body and the circumstances surrounding Dominique's death.

¶ 36    Cain contends "the medical examiner was not able to determine whether Dominique was murdered and could not rule out natural causes." He argues that "with so many uncertainties about

Dominique's manner and cause of death, the State did not prove beyond a reasonable doubt that she was killed, much less that he killed her intentionally or knowingly" and "an unsolved mystery cannot result in conviction."

¶ 37    A jury's credibility determinations are accorded great deference by a reviewing court and are rarely disturbed unless it is shown no rational jury could have found the testimony credible. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 56. The jury heard Dr. Powers' testimony, where she testified that, based on her professional examination of Dominique's body, Dominique's death was best certified as homicide by unspecified means that favored asphyxia. Dr. Powers testified she came to this conclusion based on her experience as a medical examiner, along with conducting numerous examinations of Dominique's body, including microscopic testing, ancillary studies, and toxicology testing. The jury considered the testimony of Dr. Powers and had the opportunity to determine whether Dominique died of a different cause. After consideration, they found the testimony credible, and we reject Cain's arguments. Viewing this evidence in the light most favorable to the prosecution, we find that a rational jury could have concluded that the testimony of Dr. Powers was credible. *People v. Sauls*, 2022 IL 127732.

¶ 38    Furthermore, even if a reasonable jury could not find Dr. Powers' testimony credible, the remaining evidence in the record is not insufficient to which it would create a reasonable doubt of Cain's guilt. The record indicates that Cain showed conspicuous consciousness of guilt when speaking with detectives. He initially denied having any involvement with Dominique's death until he was confronted with the fact that he was seen wheeling the suitcase down the street in which Dominique's body was found. Cain also admitted that he "stayed up all night, thinking of a way to dispose of her" before going to a nearby Walmart the next morning and purchasing the suitcase that he placed her body in.

¶ 39    Cain had strong feelings for Dominique and told detectives he wanted to "start a new life and start a family" with her, despite her being in a long term relationship with another man. The day of Dominique's death, Cain called Dominique's phone multiple times, yet she did not answer. Cain left a voicemail on Dominique's grandmother's phone "sounding upset" stating, "if you don't call me back, if I don't see you today, you better never call me again."

¶ 40    We find Cain's assertion of a contrary theory for Dominique's cause of death is not sufficient to outweigh the jury's ultimate determination or the weight they chose to assign to the evidence. *Pintos*, 133 Ill. 2d 286 (1989). Weighing the evidence in a light most favorable to the prosecution, we do not find the evidence to be so improbable or unsatisfactory as to raise a reasonable doubt of guilt.

¶ 41                              B. Prosecutorial Misrepresentation

¶ 42    Cain argues he should receive a new trial for alleged prosecutorial misrepresentation of the evidence in closing and rebuttal remarks because "the prosecutor repeatedly misstated the evidence, including testimony from family, the medical examiner, and outside drug lab consultant." He further asserts that these errors require reversal as plain error in this closely balanced case.

¶ 43    Issues of prosecutorial misrepresentation must be preserved to be considered on appeal. *People v. Williams*, 2022 IL 126918, ¶ 48. Issues can be preserved either through objecting to the issue at trial or through a post-trial motion. Here, because all but one issue, the argument that Dr. Powers eliminated death by overdose and natural causes, were unpreserved on appeal, we review these remarks for plain error. *People v. Sebby*, 2017 IL 119445, ¶ 48. Plain error is analyzed in one of two ways: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the

seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

¶ 44    First, it is well established that prosecutors are afforded wide latitude in making closing arguments. *People v. Wheeler*, 226 Ill. 2d 92 (2007). The prosecution is allowed to comment on the evidence and draw reasonable inferences from it. *Id.* If the jury could have reached a contrary verdict had the improper remarks not been made, or if the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *People v. Fields*, 2012 IL App (1st) 112191; *People v. Wheeler*, 226 Ill. 2d 92. Plainly, if we were to take the remark out, as if it had never been uttered, would the jury have decided differently?

¶ 45    In this case, it is crucial to examine whether the prosecutor's comments during closing and rebuttal arguments were indeed improper and whether they individually tipped the scales of justice against Cain. We address each alleged misrepresentation in turn.

¶ 46                    1. "No Doubt About the Cause of Death Being Homicide"

¶ 47    Cain claims the State made a misrepresentation of the evidence by stating Dr. Powers had "no doubt about the cause of death being homicide" in their rebuttal closing argument. Taken in context, the State's full statement reads "…it's the evidence that shows to the doctor, to you as experts in commonsense, that there is no doubt Dominique died at the defendant's hands." We find that this is not an obviously false statement. The phrase "no doubt" here is used instead of the more formalistic standard of proof language: beyond a reasonable doubt. We interpret the State's position as claiming that the evidence presented in the case, clearly proves, in their view, that Cain murdered Dominique.

¶ 48    If this remark were stricken or never made, there is no indication that the jury would decide differently. When reviewing the record, Dr. Powers concluded Dominique's death was homicide by unspecified means and stated that choosing this cause of death "involves excluding any and all other possible causes of death." Although Cain questions Dr. Powers' certainty on the cause of death itself, the State's remark is a rational inference based on the evidence presented. *People v. Hernandez*, 2014 IL App (1st) 130363.

¶ 49        2. Dr. Powers eliminated drug overdose or natural causes as a cause of death

¶ 50    In their rebuttal closing argument, the State remarked, "[i]t was eliminated that Dominique Ferguson died of natural causes, and [i]t was eliminated that a drug overdose or toxicity was any cause of death in this case." This claim is based on Dr. Powers' testimony where she stated, that choosing to classify Dominique's cause of death as homicide by unspecified means "involves excluding any and all other possible causes of death."

¶ 51    Cain questions whether Dr. Powers could, with absolute certainty, exclude all other causes of death. He asserts that drug overdose, death by natural causes, and a cardiac channelopathy were not specifically eliminated with absolute certainty. However, the record indicates that Dr. Powers excluded death by natural causes, drug overdose, and toxicity during her testimony. When asked on direct examination whether she was able to exclude toxicology as a possible cause of death; she stated, the "toxicology testing yielded no results that were contributory to her death." Dr. Powers further testified that following an internal examination of the body, including reviewing sections of the tissue under a microscope, she did not observe any signs of natural cause of death with respect to Dominique's vital organs. Although Dr. Powers agreed that she could not rule out cardiac channelopathy, death by natural causes, genetic conditions, or other drugs not tested for, she determined the cause of death based on her experience and the tests ran on Dominique's body.

We find the statement that Dr. Powers "eliminated" other causes of death is a rational inference based on the evidence presented. *People v. Hernandez*, 2014 IL App (1st) 130363.

¶ 52          3. Broadened Scope of Dominique's Family Medical History

¶ 53    Cain argues that there was a misrepresentation of Dominique's family medical history when the State recounted on rebuttal that you "don't die of natural [causes] at a young age in that family." He argues: 1) the State did not specifically ask about channelopathies and instead asked about unexplained deaths, and 2) the State only asked the narrow question about the medical history for family members that live outside Chicago. We find that neither of these claims amount to misrepresentation because the record shows that the State made a reasonable inference from Tonya's testimony. *People v. Hernandez*, 2014 IL App (1st) 130363.

¶ 54    The State did not specifically ask Tonya about cardiac channelopathies but, the State did ask about any unusual or unexplained deaths in the family. As clarified in the testimony of Dr. Powers, a cardiac channelopathy is a genetic condition that can result in sudden death with few external warning signs. We find the State made a reasonable inference from Tonya's testimony that no one in the family has inexplicably died. *Id*. This inference was supported by the State's initial question about the medical history of Tonya's family, both in Chicago and elsewhere, specifically asking if she was aware of any unusual or unexplained deaths among her relatives.

¶ 55    Cain's arguments fail because the State's remarks were based on a rational inference of the evidence presented at trial and there is no indication that the jury would have decided differently had the remarks never been made. *Id*.

¶ 56          4. Foam Cone Evidence in Closing Supposedly Not Elicited in Testimony

¶ 57    Cain argues the State made up evidence that foam cones form in minutes or hours, to support their argument that if an overdose caused Dominique's foam cone, it would have been disturbed in the suitcase.

¶ 58    In their closing argument, the State remarked, "[s]o if this was [the] foam cone that was there that was present from an overdose, you would expect that foam cone to have occurred, come out of her system on Christmas Day, maybe a couple hours after she dies, a couple minutes, okay, it would be there on Christmas Day." Dr. Powers testified that there were no significant changes in the foam cone found on Dominique between the pictures taken at the scene and those taken at the start of the autopsy. She confirmed that foam cones can change, be disrupted, and can occur due to manipulation of the body or pressure. She stated that the position in which Dominique was found created pressure in her chest and lungs.

¶ 59    Based on the evidence presented, we find the State made a rational inference regarding the foam cone shown in the pictures taken at the scene and the Medical Examiner's Office. *People v. Hernandez,* 2014 IL App (1st) 130363.

¶ 60          5. Frequency and Circumstance of Synthetic and Designer Opioid Cases

¶ 61    Cain argues that because the State mentioned that only nineteen of thousands of cases tested positive for novel opiates, this amounts to a misrepresentation of the evidence. Papsun initially testified that NMS Laboratories runs thousands of blood tests every day. She further explained that of those thousands of tests, the lab selects a few that warrant additional analysis either for unsatisfactory results or where the scene warranted further testing. Of those selected, nineteen cases involved fentanyl or designer opioids.

¶ 62    Papsun stated there were only "19 reported cases for furanyl fentanyl and U-47700" found without the presence of other drugs in her case study. When asked directly by the State if that

14

equated to nineteen cases out of the thousands of cases NMS sees daily, she replied "it is difficult to say" because the nineteen cases were selected for additional testing "because the testing that was performed obviously didn't satisfy the question at hand." However, when the State asked her if "You would also agree with me that in the grand scheme of things, these designer opioid deaths occurred far less frequently than heroin, fentanyl, and routine opioid deaths; correct?" Papsun stated, "I believe because they are less common, you can make that correlation."

¶ 63    We find Cain's argument that the State misrepresented the frequency of the novel drug cases is weakened by a straightforward conclusion. Of the thousands of tests conducted by the lab daily, certain cases were identified as requiring more testing. Nineteen of those selected cases exhibited fentanyl analogs or designer opiates with no other drugs present. We do not discredit or disregard Papsun's caution about the absolute nature of these numbers, but we find the State's remark to be a proper inference that either affected Cain's substantive rights or significantly affected the fairness of the trial. *People v. Hernandez*, 2014 IL App (1st) 130363.

¶ 64    We conclude that none of Cain's contentions amount to prosecutorial misrepresentation because the statements at issue are either directly addressed in the court record or fall under the category of a supported inference. *Id*.

¶ 65                              D. Ineffective Assistance of Trial Counsel

¶ 66    Cain argues he received ineffective trial counsel because counsel: (1) failed to elicit testimony that was elicited during the first trial and (2) failed to object to the State's improper arguments that would have preserved trial errors, thus counsel's mistakes prejudiced him.

¶ 67    To succeed on a claim of ineffective assistance of counsel, Cain must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced him, meaning there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. *People v. Steidl*, 142 Ill. 2d 204 (1991); *People v. Clendenin*, 238 Ill. 2d 302, 939 N.E.2d 310 (2010); *People v. Jones*, 2023 IL 127810.

¶ 68    The first prong requires showing that counsel's actions were not within the range of competence demanded of attorneys in criminal cases. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and strategic decisions made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 94.  The second prong requires Cain to show that the deficient performance prejudiced him. This means demonstrating a reasonable probability that, but for counsel's errors, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *People v. Roland*, 2023 IL 128366, ¶ 26.

¶ 69    First, as noted in Cain's brief, reviewing courts indulge a "strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Othman*, 2019 IL App (1st) 150823, ¶ 70. We find that defense counsel's lack of questioning about Dr. Powers' "favors asphyxia" statement, as well as her autopsy report, does not amount to ineffective trial counsel. In fact, by Cain's own admission, trial counsel questioned Dr. Powers on her report, on the petechiae, and on the exclusion of a drug overdose or natural causes as a cause of death, thus showing the variety of approaches trial counsel took to plead Cain's case.

¶ 70    Contrary to Cain's assertion, this case is not like *People v. Upshaw*, where the court found trial counsel ineffective for failing to present exculpatory evidence of which counsel was aware. 2017 IL App (1st) 151405, ¶ 39. Trial counsel's decision to not question Dr. Powers about the

addition of 'favors asphyxia' or Detective Braun about Cain's state of panic, does not amount to a failure to present exculpatory evidence.

¶ 71    Cain contends that trial counsel failed to object to the State's alleged misrepresentations during closing arguments, which amounts to ineffective assistance, thus prejudicing him. We find this argument is without merit because, while failure to preserve trial errors for appeal can be the basis of an ineffective counsel claim, the unpreserved issues must be substantial enough to have affected the trial's outcome. *People v. Coleman*, 158 Ill. 2d 319; *People v. Babiarz*, 271 Ill. App. 3d 153. As stated previously, while unpreserved errors can be reviewed on appeal under the plain error doctrine, the States' remarks at issue were proper as they were inferences based on the evidence presented. *People v. Hernandez*, 2014 IL App (1st) 130363.

¶ 72                                                  CONCLUSION

¶ 73    We conclude that the evidence adequately supports Cain's conviction for first degree murder and concealment of a homicidal death and the State's remarks did not adversely affect the outcome of this case. Trial counsel's performance was not deficient for failing to elicit previously known favorable testimony and for not objecting during the State's closing arguments.

¶ 74   Affirmed.